## HOLUB v. STATE.

Opinion delivered January 11, 1915.

1. EVIDENCE—BLOOD HOUNDS—QUALIFICATIONS.—Evidence of the performance of blood hounds is admissible in a prosecution for grand larceny when the dogs followed the trail to defendant's house, where there is evidence that the reputation of these same dogs for trailing criminals was good, and when witness had seen them perform in trailing criminals, and knew that these were the same dogs.

2. LARCENY—CONVICTION—SUFFICIENCY OF THE EVIDENCE.—In a prosecution for grand larceny, evidence held sufficient to warrant a verdict of guilty.

Appeal from St. Francis Circuit Court; *J. M. Jackson*, Judge; affirmed.

#### STATEMENT BY THE COURT.

Appellant was indicted for grand larceny alleged to have been committed by stealing five hogs, the property of H. Loewer. It appears from the testimony that Loewer was the manager of a stock ranch in St. Francis County and in control and possession thereof and interested jointly with the owners in the live stock on the ranch; that they bought 200 head of hogs in January and February, 1913, and lost about forty head during the two months. One Houghton claimed a sow and four shoats and some pigs that were in Loewer's field, and came Sunday to get them, bringing three boys with him to look through the pasture. He was told by Loewer, who did not know him before, that he did not care to do business on Sunday, and requested to come back at another

time, when they would be given permission to look through the pasture for the hogs. He came back Monday and found where the fence had been torn up and a hole where hogs had gone out. Loewer went immediately to Wheatley and had Mr. Smith, president of the bank, to telegraph for some bloodhounds to be sent from Dyersburg, Tenn. They reached Wheatley that night and were taken to the place where the fence was broken and the hogs had escaped, between 3 and 4 o'clock the next morning. A guard had been placed at this opening Monday evening. The dogs took the trail at the gap, went across the road out on the path and followed it through the prairie and to Holub's house, where he was arrested. Six or seven hogs' heads were found in his smokehouse, and the ears had been freshly cut off from some of them and were not found. A witness testified that he saw several of his hogs in Holub's field with their ears cut off that he identified positively one of them and got him back, but had not been able to get the others.

Before the next term of court, after the indictment was found, Loewer was notified that the sow with the five shoats claimed by Houghton had been found dead in his pasture with their ears cut off, three of them had small bullet holes in their heads. They had been dead for some time and piled up in an old clay root. Holub lived about one and a half miles from Loewer's house on the ranch, and about that distance from where the hogs escaped from the field.

Another witness testified that he helped the defendant to drive thirty or forty hogs out of the Loewer pasture Sunday night, that they drove them about a mile away and left them near a hay stack, and that the next day they went and drove seventeen of them across the creek, back in the woods, in toward Holub's place.

Another witness testified to seeing Evans and Holub driving hogs in the woods across the creek about the time the hogs were charged to have been stolen.

Another testified that he heard shots in the woods back of Holub's house about 4 o'clock on the morning of

the day he claimed to have killed hogs in his pen, and that he saw some hogs out in the woods dead, one of them on the bank of the creek which he afterward saw piled up in the clay root with the others in the Loewer pasture; that he saw puddles of blood where the other hogs had been shot and had been dragged away.

The defendant testified that he did not take the hogs and had never taken any property of Loewer's from the ranch controlled by him; denied that he ever took any hogs from the pasture, with the assistance of Whaley or any one else; denied that he killed the hogs that were found in his smokehouse out in the woods, and stated that they were hogs that had been kept in the pen by the house for some time and fattened and that the ears were cut off the heads of some of them by the boys in cleaning the hogs, because it was difficult to clean them.

Two other witnesses testified also that the hogs which were found at Holub's place were hogs that were kept up and killed there out of the pen and that they had helped to clean them, and, in doing so, found it more convenient to cut the ears off of some of them, and that the ears were cut off solely because they could not be cleaned.

Holub stated that he went down to Wheatley on Sunday morning, and in coming along back home he had gone by the road and the gap in the fence from which the hogs were supposed to have been taken or escaped; that he had gone from there home, explaining thus the dogs taking the trail to his house. When the officers arrived with the dogs and walked in, he came out and said he was expecting them. He did not deny this, but said he thought it was the constable who wanted him to go along to help him make an arrest. He said he went out and spoke to the dogs, and that neither of them manifested any interest in or paid any special attention to him, one of them finally getting up after he snapped his fingers two or three times over its head.

Another witness testified that upon Holub's coming out of the house, one of the dogs sprang the full length of his chain toward him.

The testimony shows that the hogs, the heads of which were found at Holub's house, were shoats, about the size of the ones lost or missing from Loewer's ranch and pasture.

Other witnesses testified that the dead hogs found in the clay root were those claimed by Houghton, and that they had been seen in Loewer's pasture on the Sunday when he and his boys went down to find them. Although they had been dead for some time, the witnesses said the hair was still intact, and they identified them positively as the hogs claimed by Houghton.

The witness testified that in January or February on Sunday night he and Holub turned out of Loewer's pasture thirty-five hogs and drove them away about a mile northeast, where they left them until morning, and then drove them two or three miles into the woods and left them, where they scattered; that he went back and got several of them and took them to his house on Holub's place, and on the next day "we drove these seven hogs across the creek and left them there in the woods." He did not know what became of them. That he got up seventeen of the others the next day, put them in the barn and helped to drive them to the same place where they had taken the seven; that he thought these hogs were in Loewer's mark; that they took these hogs out of the pasture at night at the gate by raising it. That they killed one of the hogs, and he got half of it and Holub the other half.

This witness admitted that he had had trouble with the defendant; that they were not on good terms, and that he had been employed to get up testimony in the case. He said they got the hogs out at the gate about a mile from Loewer's house, between 7 and 9 o'clock at night, and that the gate was locked, and they lifted it up and took some of the staples out and afterward put them back. That they were to divide the hogs that they took out of the pasture, and that he and Holub were good friends until the last term of court.

Appellant objected to the introduction of the testimony relating to the performance of the hounds in trailing from the gate where the hogs were taken out of the pasture to defendant's house and while there, because they were not shown to be accurate and skilled in following the trail of persons.

A witness testified, however, that he knew the dogs and knew they were capable and skilled in trailing people; that he had known them to trail a criminal from a place in Wheatly to Cotton Plant at another time where the hunted man took the train and escaped.

The court instructed the jury, and from the judgment of conviction appellant has appealed.

*R. D. Smith, R. J. Williams, W. J. Lanier* and *J. W. Story,* for appellant.

1. The verdict is not sustained by the evidence. The ownership was not proven. The only evidence tending to connect defendant with the crime was that dogs trailed to defendant's house, and the testimony of Evans, a self-confessed thief and an accomplice without corroboration.

2. The dogs were not proved to be qualified so as to admit the evidence of trailing defendant. 132 Ky. 269; 116 S. W. 344; 92 N. E. 161; 153 N. C. 591; 16 L. R. A. (N. S.) 285. This evidence was incompetent.

3. Allegations of ownership are material, and must be proved as alleged. 97 Ark. 1; 55 Ark. 244; 58 *Id.* 17; 73 *Id.* 32; 108 *Id.* 418.

4. There was error in refusing witnesses permission to answer questions propounded as to mistakes in testimony given and to show the feeling toward defendant.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepy,* Assistant, for appellee.

1. There is ample evidence to support the verdict. The finding is conclusive if there is any legal evidence. *Tiner* v. *State,* 109 Ark. 138; *Easley* v. *State,* 109 Ark. 130.

2. The testimony as to the bloodhounds being *experts* in their line was sufficient.

3. There is no error in the instructions. Exclusive possession by the husband of the wife's property is suffi-

cient to sustain an indictment for larceny of property alleged to be the husband's.    105 Ark. 12; 80 *Id.* 495-7.

4.   The court properly refused to permit Henning to answer questions as to mistakes made in the testimony given in the examining court.   It was immaterial as the trial in the circuit court was *de novo.*

KIRBY, J., (after stating the facts).   It is contended that the court erred in admitting the testimony relative to the action of the hounds in taking the trail at the place where the hogs escaped and following it to defendant's house, because there is no sufficient showing of the qualification of the dogs to accurately trail human beings.   Mr. Smith, the president of the bank, who telegraphed for the dogs, stated not only that he had heard a good deal about them running criminals down, that the reputation of the dogs for running criminals was good, but also that he got the dogs and had seen them trail some criminals one time from Wheatley to Cotton Plant, and that they did not catch them, because they took the train there; that he knew the dogs used in this case and they were the same ones.

(1)   We think this was a sufficient showing of the qualifications of the hounds, to admit the testimony of their performance in taking the trail at the gap where the hogs were known to have escaped and where witness testified they had been driven out after the posts were raised and the staples pulled by himself and the defendant, and following it around and across the prairie to Holub's house.   For a discussion of the admissibility and effect of such testimony, see *Pedigo* v. *Commonwealth,* 103 Ky. 41, 42 L. R. A. 432, 82 Am. St. 566, 44 S. W. 143; *Sprouse* v. *Commonwealth,* 132 Ky. 269, 116 S. W. 344; *State* v. *Norman,* 153 N. C. 591; *Spears* v. *State,* 16 L. R. A. (N. S.) (Miss.) 285, 46 So. 166.

(2)   It is next contended that the evidence is not sufficient to sustain the verdict.   It is quite voluminous and contradictory to some extent.   We do not regard it necessary to set it out more fully or further analyze it, it being, in our opinion, amply sufficient to support the ver-

dict. The instructions upon the whole case fairly sub-
mitted the issues to the jury.

Finding no prejudicial error in the record, the judg-
ment is affirmed.